ADAM GORDON
United States Attorney
MARIO J. PEIA
ALEXANDRA F. FOSTER
California Bar No. 307503
Washington, D.C. Bar No. 470096
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel.: (619) 546-9706/6735
Email: Mario.Peia/Alexandra.Foster@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN ALEXIS PATRON LOPEZ,<br><br>Defendant. | Case No.: 21cr1683-WQH<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL BASED UPON JUROR MISCONDUCT**<br><br>Honorable William Q. Hayes |

Juror 1 received a spam message just after closing arguments. She immediately knew it was a spam message. The few jurors who knew about the message before being discharged all treated the message as spam and believed it had no connection to the case. All jurors testified that they did not feel intimidation, fear, or concern, that they could be fair and impartial, and that they could listen to and follow the Court's instructions. The messages had no influence on the jury, and Defendant's motion is factually and legally meritless. It should be denied.

//

//

//

# I.

## FACTUAL BACKGROUND

On March 19, 2025, the jury returned a verdict and was polled without issue. The jury was then discharged. After discharge, the Bailiff walked into the jury room to collect the trial exhibits. The Bailiff encountered Juror 1 in the jury room, who held up her phone and told the Bailiff she had received a text message the day before from a phone number out of Denver. The text was sent from "Vanessa." The number and name were unknown to Juror 1. Juror 1 said she thought the name was similar to a name mentioned in the case and asked the Bailiff what to do. The Bailiff gave no advice and did not investigate further. The Bailiff did not read the text message, and did not ask Juror 1 any questions.

Between May 16, 2025, and May 21, 2025, the Court held evidentiary hearings and spoke with every deliberating juror. The relevant substance of their testimony is summarized as follows:

a. <u>Juror 1</u>

Juror 1 did not retain a copy of the text messages. Instead, "she blocked [the sending phone number] and deleted it," *see* Ex. 1, Tr. of May 16, 2025 Hr'g, p. 5, but she estimated that there were less than 10 messages, *id*. She recalled the first message said something to the effect of, "Oh hi, how are you?" *Id*. at 6. Juror 1 said the sender provided the name "Vanessa Zhang," and that they met at a charity gala. *Id*. Juror 1 said she "knew it was a scam, because I was like I don't go to charity galas." *Id*. Juror 1 responded "more firm" that this was a wrong number and not to contact her, before blocking the sender and deleting the messages. *Id*. Juror 1 recalled receiving the messages after closing arguments, as soon as she got home. *Id*. at 7.

While deliberating, Juror 1 checked her notes and saw the name "Vaness," prompting her to speak with two other jurors to get a "second opinion." *Id*. at 7–8. She showed them the text messages after recovering them from the deleted file folder. *Id*. at 8. Juror 1 showed them the messages, privately, during one of the breaks. *Id*. at 11. The other jurors told Juror 1, "this is a weird coincidence, but nothing to be concerned about," *id*. at 8, and "It's not

important. It's not something to be worried about," *id*. at 11. Juror 1 searched the sending phone number in Google, which indicated it was from Colorado. *Id*. at 8–9. She then recalled that one of the witnesses "was being held or incarcerated in Colorado." *Id*. at 9. "So those to factors made [Juror 1] think maybe this is associated, but odds are it's not." *Id*. Ultimately, Juror 1 "personally had concluded, like, this is not something that's important. It's most likely spam with nothing that's actually connected with what's being discussed here." *Id*. at 9–10.

When questioned by the Court, Juror 1 confirmed she had no fear "at all" of any retaliation against her from any individual if she voted to acquit or convict. *Id*. at 10. When asked whether she felt any intimidation or fear or concern from the messages, Juror 1 answered, "I mean, to be quite honest, no. But just to be someone that's protective of my own safety, I didn't want to take a chance. So, ultimately, no, but I was wary." *Id*. Juror 1 dealt with the "wary" feeling by speaking with the other two jurors and the bailiff. *Id*. Juror 1 said she spoke with the bailiff "because he works in the system" to get his opinion about "if this is actually something to be concerned about just for [her] own peace of mind." *Id*. at 10–11. Juror 1 said, "Because I knew that if I didn't ask and then left here, it would just keep …being in my mind, and I just wanted to put it to bed." *Id*. at 11.

When asked whether the "text message in any way impact[ed] your ability to be fair and impartial," Juror 1 responded, "No, not at all." *Id*. Juror 1 gave the same exact answer when asked whether the text messages negatively impacted her ability to listen to and follow the instructions from the Court. *Id*. at 12.

    b. <u>Juror 3</u>

Juror 3 testified that Juror 1 spoke with him about the text messages, and estimated it was "much before closing arguments …within three days or four days of starting." Ex. 1, p. 20–21. Juror 3 said, "[Juror 1] showed me the message and let us know that she had contacted you and informed about the text message." *Id*. at 21. Juror 3 later confirmed that Juror 1 showed him the message "as we were walking out after verdict was reached." *Id*. Juror 3 testified that it "sounded like a scam message" and that he "quickly dismissed it."

*Id*. Juror 3 confirmed that, "personally, [he] thought it was just pure coincidence." *Id*.  Juror 3 told the Court that several jurors had "informal" "not substantial" conversation about the message, and that it was a "few minutes." *Id*. at 22–23. When asked about his thoughts about the message, Juror 3 stated, "I, on a daily basis, get just random text messages from people. I think it's a common messaging scheme. So for me, it was purely coincidence, the name and location. And I didn't think it was – I mean, but I understand the reason for raising the —you know, the issue, but I didn't think it was anything that would warrant further action." *Id*. at 23. When asked whether Juror 3 perceived the text message to be connected to this case, Juror 3 responded, "Absolutely not. And I made that clear at the time." *Id*. at 24.

Juror 3 was asked whether he feared any retaliation from any individual, and answered, "Absolutely not. That did not factor into the decision at all, did not come up in the deliberation. I just want to state that." *Id*. Juror 3 testified that he did not feel any intimidation, fear, or concern as a result of the text message, *id*., and that the text message did not negatively impact his ability to be fair and impartial, *id*. at 25. Juror 3 confirmed that the text message did not affect his ability to follow the Court's jury instructions. *Id*.

Juror 3 testified that he originally heard about the message from a juror other than Juror 1. *Id*. at 26. On being asked about what others expressed about the text message, Juror 3 described the feeling as "a little bit of awareness and maybe some caution, particularly from Juror 1." *Id*. Later in the hearing, Juror 3 described the feeling about the text message as being "curiosity, entertaining." *Id*. at 30. Juror 3 contextualized the feeling as, "we're here for eight hours a day. This is all we're doing. And then this comes up, and it's like, something to talk about. That would probably be the extent." *Id*. Nonetheless, Juror 3 testified that he did not hear any of the jurors express fear over the text message. *Id*. at 27.

c.  Juror 7

Juror 7 testified that Juror 1 showed her a text message after closing arguments. Ex. 1, p. 39. Juror 7 said Juror 1 showed the text during a break. *Id*. Juror 1 asked Juror 7 if she

thought it was something to be concerned about, and Juror 7 said no. *Id*. at 40. Juror 7 did not perceive the text message as being connected to the case. *Id*. at 40, 44.

Juror 7 testified that she did not fear retaliation, for acquittal or conviction, from any individual due to the text message. *Id*. at 40–41. Juror 7 did not feel any intimidation, fear, or concern as a result of the message. *Id*. at 41. The message did not impact Juror 7's ability to be fair and impartial, nor did it affect her ability to follow the Court's jury instructions. *Id*.

On further questioning, Juror 7 testified that the next time she heard about the text message was after deliberations and discharge *Id*. at 44, 45.

d. <u>Jurors 2, 4, 6, 12</u>

Jurors 2 (Ex. 1, p. 17–18), 4 (Ex. 1, p. 32, 37), 6 (Ex. 2, Tr. of May 19, 2025 Hr'g, p. 4), and 12 (Ex. 1, p. 48, 50) all learned about the text messages for the first time after the verdict was rendered and the jurors were discharged, so the messages had no effect on their deliberations.

e. <u>Jurors 5, 8, 9, 10, 11</u>

Jurors 5 (Ex. 2, p. 3), 8 (Ex. 2, p. 7), 9 (Ex. 1, p. 46–47), 10 (Ex. 3, Tr. of May 21, 2025 Hr'g, p. 3–4), and 11 (Ex. 2, p. 8), never learned anything about the text messages, either before or after being discharged, so the messages had no effect on their deliberations.

## II.

## ARGUMENT

The legal standards to apply depend on the type of juror influence or misconduct. Defendant conflates the distinct doctrines. But under any standard, there was no prejudice and Defendant's motion should be denied.

Defendant titled the motion as addressing juror misconduct and included a paragraph arguing that Juror 1 engaged in misconduct, Def.'s Mot., Dkt. No. 372, p. 10. But the case law cited in Defendant's motion address jury tampering. *See id*. at 7–8 (citing *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999), *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993), and *United States v. Simtob*, 485

F.3d 105 (9th Cir. 2007)). The Ninth Circuit "expressly distinguishes the 'prosaic kinds of jury misconduct' cases …from the 'much more serious intrusion' of a bribe or threat." *Henley*, 238 F.3d at 1116 (quoting *Dutkel*, 192 F.3d at 895). In *Henley*, "[r]ather than examining whether the bribery attempt 'interfered with the jury's deliberations by distracting one or more of the jurors, the [district] court considered whether the jury was 'substantially swayed' by the alleged misconduct." 238 F.3d at 1115 (quoting *Dutkel*, 192 F.3d at 897. Because "[t]he standard applied by the district court derive[d] from jury misconduct cases that do not involve allegations of jury tampering, but rather involve more common and less pernicious extraneous influences on jury deliberations," the *Henley* Court remanded for consideration of jury tampering standards akin to those provided in *Dutkel*. *Henley*, 238 F.3d at 1116.

The Ninth Circuit later laid out a two-step framework to use "when faced with allegations of improper contact between a juror and an outside party." *Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017). The *Godoy* Court expressly "disapproved" of any notion, such as in *Dutkel*, that the "presumption attaches under only more limited circumstances," and clarified that "any outside contact raising a credible risk of influencing the verdict triggers the presumption of prejudice." *Godoy*, 861 F.3d at 968 n.6. *See also Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016) ("clearly established federal law also compels a criminal trial court to consider the prejudicial effect of *any* external contact that has a 'tendency' to influence the verdict, irrespective of whether it is about the matter pending before the jury" (quoting *Mattox v. United States*, 146 U.S. 140, 150–51 (1892) (emphasis in original)).

On balance, and considering that "allegations involving prosaic kinds of jury misconduct" are addressed in step one of the *Godoy* Court's two-step framework (as discussed further below), the government recommends this Court apply the *Godoy* two-step framework regardless of whether Defendant's motion is considered one for jury tampering or misconduct.

//

6

a. *Legal Standards*

According to the *Godoy* two-step framework, "the court asks at step one whether the contact was possibly prejudicial. If so, the contact is deemed presumptively prejudicial and the court moves to step two, where the burden rests heavily upon the [government] to establish the contact was actually harmless." *Godoy*, 861 F.3d at 962 (9th Cir. 2017) (citations and quotations omitted).

At step one, the defendant bears the burden and "must present evidence of a contact sufficiently improper as to raise a credible risk of affecting the outcome of the case." *Id*. at 967. Although the defendant's burden at step one is not "onerous," *Godoy*, 861 F.3d at 968, the burden cannot be met by "allegations involving prosaic kinds of jury misconduct," *Godoy*, 861 F.3d at 967.

In *Clark v. Chappell*, 936 F.3d 944, 970–71 (9th Cir. 2019), the Ninth Circuit split the inquiry into two. First, the defendant must demonstrate that "the juror's contact with the non-juror was "*sufficiently improper*." *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967) (emphasis in original). The Ninth Circuit has "recognize[d] the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict." *Id*. "For example, chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator, do not trigger the presumption because they are '[t]hreadbare or speculative allegations' of misconduct." *Id*.

Second, the court must determine "whether the sufficiently improper contact gives rise to a '*credible risk* of affecting the outcome of the case.'" *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967) (emphasis in original). Courts should "consider[ ] the full context of the contact to determine whether a credible risk of prejudice exists." *Godoy*, 861 F.3d at 967. "Whether an unauthorized communication between a juror and a third party concerned the case is but one factor in determining whether the communication raised a risk of influencing the verdict." *Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004). "Other factors may include the length and nature of the contact, the

1    identity and role at trial of the parties involved, evidence of actual impact on the juror, and

2    the possibility of eliminating prejudice through a limiting instruction." *Id*. at 697–98.

3        If the defendant's step one burden to show "a possibly prejudicial contact" is met, the

4    court moves to step two of the framework, where the presumption of prejudice attaches.

5    *Godoy*, 861 F.3d at 968 (citations omitted). At step two, "the burden shifts to the

6    [government] to prove the contact was harmless." *Id*.  "Harmlessness in this context means

7    'that there is no reasonable possibility that the communication ... influence[d] the verdict.'"

8    *Id*. (quoting *Caliendo*, 365 F.3d at 697). "[T]he [government] must rebut the presumption

9    by pointing to some evidence contrary to the evidence that established it. Drawing contrary

10   inferences from the same evidence is not enough." *Id*. The government may rebut the

11   presumption in numerous manners, including that it "might find contrary evidence

12   elsewhere in the existing record that sheds new light on the potentially prejudicial

13   communication." *Id*. at 969. Through a hearing, the court should consider "the

14   circumstances [of the improper conduct], the impact thereof upon the jur[y], and whether

15   or not it was prejudicial." *Id*. (quotations and citations omitted).

16       b.  *Step 1 Application*

17       Juror 1 received a spam message. She immediately knew it was a spam message. *See*

18   *United States v. Rutherford*, 371 F.3d 634, 642 (9th Cir. 2004) ("in determining whether the

19   presumption of prejudice should apply, we again look[ ] not to the intent of the individual

20   alleged to have tampered with the jury, but rather to the juror's perceptions to the conduct

21   at issue") (citing *United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001)). Here, Defendant

22   cannot demonstrate the contact was "sufficiently improper," nor that it gave rise to a

23   "credible risk of affecting the outcome of the case." Defendant's motion should be denied

24   on this basis.

25       From the outset, testimony at the evidentiary hearing demonstrates the spam message

26   did not concern the case. Juror 1 knew that immediately. The sender said they met at a

27   charity gala, but Juror 1 "knew it was a scam, because [she] doesn't go to charity galas."

28   Juror 1's discussions with two other jurors and the bailiff do not suggest otherwise. Juror 1

testified that she was seeking a "second opinion" from the two other jurors, and approached the bailiff because "he works in the system." Juror 1 consistently and credibly testified that she "personally concluded …this is not something that's important. It's most likely spam with nothing that's actually connected with what's being discussed here." Jurors 3 and 7, the other jurors with whom Juror 1 spoke, confidently told the Court they thought the message was a scam, and nothing to be concerned about.

Similarly, Defendant's allegations that Juror 1 engaged in misconduct for failing to report the contact is a misinterpretation and exaggeration of the spam message and Juror 1's perception of it. Juror 1 did not report the contact because she did not think much of it. She quickly knew this was a wrong number and not related to the case,[1] because she did not attend charity galas. And her cautious approach was to settle her own "peace of mind …because [she] knew that if [she] didn't ask and then left here it would just keep …being in my mind, and [she] just wanted to put it to bed." But Juror 1's follow up was not rooted in fear or concern. She unequivocally testified that she did not fear retaliation, nor did she feel intimidation, fear, or concern; she could be fair and impartial; and she could listen to and follow the Court's instructions.

The other factors also cut against Defendant's position. First, this was a short, written contact, and Juror 1 quickly blocked and deleted the wrong number. The messages did not contain threats, and they did not make reference to the case itself. And, as discussed immediately above, Juror 1 ultimately knew the messages were not related to the case itself.

Second, even if Juror 1 were to have truly believed the messages were connected to the case, they would have been connected to one of the witnesses, not one of the parties of the case. Considering the government called the witnesses, it would be unclear—in the speculative event that Juror 1 connected the messages to the case—whether Juror 1 would hold that against Defendant or the government. This is not a scenario like in *Angulo*, cited

---

[1] Juror 1's Google research similarly was not related to the facts of the case itself, and did not introduce any extraneous information about the case to the jury. Juror 1 simply "Googled the phone number to see if it would link to someone's social media that [she] knew." Ex. 1, p. 9.

by Defendant, where "the remaining jury members may well have believed that defendants were responsible for the threat and, based on that assumption, may have decided the merits of the case on that basis." 4 F.3d at 847.

Third, and perhaps most importantly, there is no evidence of any actual effect on the other jurors. Juror 1 was not influenced. Jurors 3 and 7 were not influenced. All three—the only jurors to testify that they learned about the messages before the verdict was rendered—testified they did not believe the messages had any connection with the case. It is unsurprising, therefore, that they all readily testified they did not fear retaliation; did not feel intimidation, fear, or concern; could be fair and impartial; and could listen to and follow the Court's instructions. And, since no other juror testified that they heard about the messages before being discharged, it can be credibly inferred, even beyond Juror 3's spontaneous statement that the messages did not come up during deliberations, that the messages were not discussed with the larger group during deliberations. There is no evidence that the messages had a meaningful impact on any juror. This factor illustrates that the messages did not give rise to a credible risk of affecting the outcome of the case.[2]

Defendant nonetheless argues that the text messages "distracted" the jurors from their duties. *See* Def's Mot., p. 6–7. This argument is unpersuasive and the precedent Defendant uses to support it is easily distinguishable. In *Dutkel*, cited by Defendant, the juror faced repeated contacts with individuals who offered a bribe. 192 F.3d at 898. The repeated contacts "left [the juror] … a disturbed and troubled man, deeply concerned about his own and his family's safety." *Id.* (internal quotations and citations omitted). That is a far cry from the facts in this case. As the Court recognized during the evidentiary hearing, *see* Ex. 1, p. 13, almost anything can distract a jury to an extent, but the messages here did not distract to a meaningful degree.

Moreover, the four cases Defendant primarily relies on—*Henley*, *Dutkel*, *Angulo*, and *Simtob*—all addressed whether an evidentiary hearing was required, not whether the

---

[2] The final factor, the possibility for a limiting instruction, is moot given the timing of the reporting. Juror 1 spoke to the Bailiff, which was the first time the messages came to the attention of the Court or the parties, after the jury had been discharged.

defendant was prejudiced. In *Simtob*, for example, the Ninth Circuit found error because "district court conducted no inquiry of the juror from which it could draw any inferences of the juror's impartiality." 485 F.3d at 1065. Similarly, in *Angulo*, the Ninth Circuit, "remand[ed] to the district court to hold an evidentiary hearing to determine whether the jurors who knew of the threat were able to act impartially and without bias." 4 F.3d at 848. These cases were remanded for a hearing. That is not the position we are now in, as this Court already held hearings and the jurors have provided full and complete testimony.

Rather, although this is inevitably a highly fact-dependent inquiry, the facts in the present case are most similar (though less aggravated) to those presented in *United States v. Armstrong*, 654 F.2d 1328 (9th Cir. 1981). There, on the sixth day of deliberations, the court received a note from a juror stating that her husband had taken two calls the night before in which the caller had used obscene language and said, "tell your wife to stop hassling my brother-in-law in court." *Id*. at 1331. The Ninth Circuit held that the district court did not abuse its discretion in refusing to declare a mistrial. It reasoned that "[t]he calls did not refer to the merits. They did not articulate threats nor were they identified with either side. [The juror] stated in her note to the court that she would not let the calls interfere with her duty as a juror." *Id*. at 1333. While *Armstrong* is not exactly like this case, the rationale for denying the motion for a mistrial applies here. The text messages made no reference to the trial (much less the merits). The messages were not threatening, and did not identify a side. And the jurors indicated that the messages did not interfere with the jurors' duty.

Defendant's motion should be denied. All the factors weigh against him. They demonstrate the contact was not "sufficiently improper," nor did it present a "credible risk of affecting the outcome of the case."

c. *Step 2 Application*

Should the Court advance to step 2, the government can easily carry its burden to demonstrate that there is no reasonable possibility that the communication influenced the verdict. The factual considerations closely mirror those discussed above.

First, and foremost, there is no indication that the messages had any meaningful impact on the jurors' ability to perform their duties in this case. Again, the three jurors who knew about the messages before being discharged testified that they did not fear retaliation; they did not feel intimidation, fear, or concern; they could be fair and impartial; and they could listen to and follow the Court's instructions. Since most jurors did not know about the messages, it is reasonable to infer that the messages were not discussed during deliberations. And, as discussed above, the messages did not meaningfully distract Jurors 1, 3, or 7 from performing their duties.

Second, and also as discussed above, the circumstances of any improper contact were mitigated. Juror 1 immediately knew the message was spam, and her further inquiry was a product of what Juror 3 described as "caution." The messages did not relate to a matter in the case, nor did Juror 1 believe it was connected to the case. Similarly to *Armstrong*, the messages did not contain threats, did not refer to the merits of the case, and were not explicitly (or even implicitly) identified with either side. The messages did not introduce extraneous information to the jury. *Cf. United States v. Maree*, 934 F.3f 196, 202 (9th Cir. 1991) (holding that information discussed between a juror and her friends was not extraneous because it "added no information about the defendant or the case").

Finally, Defendant was not prejudiced in any way. Defendant's theory of prejudice—distraction—exaggerates the role of the messages and the degree of distraction. As discussed above, the level of "distraction" in this case falls far short of that seen in other cases cited by Defendant. The "distraction" here was—at worst—a momentary pause at the end of the trial, which is far from the bribery scenarios presented in other cases. And, again and most importantly, all jurors testified they did not fear retaliation; they did not feel intimidation, fear, or concern; they could be fair and impartial; and they could listen to and follow the Court's instructions.

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.

### CONCLUSION

There is no reasonable possibility that the text messages influenced the verdict. Defendant's motion should therefore be denied, and this matter should proceed to sentencing on November 17, 2025.


Dated:        July 28, 2025                    ADAM GORDON
                                               United States Attorney

                                               *s/Mario J. Peia*
                                               MARIO J. PEIA
                                               ALEXANDRA F. FOSTER
                                               Assistant United States Attorneys